**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| **JESSICA MOWEN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| **CITY OF FORT SCOTT, KANSAS,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **FORT SCOTT, KANSAS POLICE** ) | |
| **DEPARTMENT/ANIMAL CONTROL,** ) | |
| ) | |
| **Serve:** ) | REQUEST FOR JURY TRIAL |
| **City Commission** ) | |
| **ATTN:  Mayor Tracy Dancer** ) | |
| **123 Main Street** ) | |
| **Fort Scott, Kansas 66701** ) | |
| ) | |
| Defendants. ) | |

**<u>COMPLAINT</u>**

COMES NOW, Plaintiff Jessica Mowen (hereinafter, "Plaintiff") by and through her undersigned counsel and for her Complaint against Defendant City of Fort Scott, Kansas (hereinafter "Defendant City") and Defendant Fort Scott, Kansas Police Department/Animal Control Division (hereinafter, "Defendant Police Department") (hereinafter, collectively, "Defendants"), alleges and states as follows:

**Parties and Jurisdiction**

1.      Plaintiff is a citizen of the United States, residing in Fort Scott, Bourbon County, Kansas and, at all times pertinent to this Complaint for Damages, was an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.* ("Title VII"),

1

the Kansas Wage Payment Act, K.S.A. 44-313 *et seq.* ("KWPA"), and the Fair Labor Standards Act, 29 USC § 201 *et seq.* ("FLSA"),

2.    Defendant City is a municipality organized under the laws of the state of Kansas. At all times pertinent to this Complaint for Damages, Defendant City was an "employer" within the meaning of Title VII, the KWPA, and the FLSA.

3.    Defendant Police Department is a political subdivision organized under the laws of the state of Kansas. At all times pertinent to this Complaint for Damages, Defendant Police Department was an employer within the meaning of Title VII.

4.    This is an employment discrimination lawsuit based upon and arising within the meaning of Title VII.

5.    The unlawful acts and practices set forth below were committed within the State of Kansas.

6.    Jurisdiction and venue are proper in the District of Kansas pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1391.

### Administrative Procedure and Procedural Posture

7.    On or about August 29, 2022, Plaintiff timely filed a Charge of Discrimination against Defendants, which was filed with the Equal Employment Opportunity Commission ("EEOC") and Kansas Human Rights Commission ("KHRC"), alleging discrimination on the basis of Plaintiff's sex and unlawful retaliation. A copy of the Charge of Discrimination is attached hereto as Exhibit A and incorporated by reference as if fully set forth herein.

8.    On or about April 18, 2024, the Department of Justice ("DOJ") issued to Plaintiff a Notice of Right to Sue and this lawsuit was filed within 90 days of the issuance of the DOJ's

Notice of Right to Sue. The Notice of Right to Sue for Plaintiff is attached hereto as Exhibit B and incorporated by reference as if fully set forth herein.

9.     The aforesaid Charge of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of the EEOC investigation of Plaintiff's claims and the involved parties, which could reasonably be expected to have grown out of the Charge of Discrimination.

10.     Through the filing of Plaintiff's Charge of Discrimination, Defendants were afforded notice of Plaintiff's claims and the opportunity to participate in voluntary compliance.

11.     Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

<u>**General Allegations Common to All Counts**</u>

12.     Plaintiff is a woman.

13.     Plaintiff began working for Defendants in the Fort Scott Kansas Police Department Animal Control Division, as an Animal Control Officer ("ACO"), in or around September of 2021.

14.     During Plaintiff's time working for Defendants, Plaintiff worked seven days a week with no days off.

15.     Even when Plaintiff was sick, she still went to the kennel and fed the animals and cleaned.

16.     As an ACO, Plaintiff patrolled the community, took calls from dispatch, picked up dogs, ran the shelter, performed investigations, and wrote citations if needed.

17.     During Plaintiff's time as an ACO, Plaintiff did as much as she could to ensure the shelter was clean.

3

18.    Plaintiff did her best to engage the community to encourage members of the community to donate supplies, volunteer, and adopt animals.

19.    Plaintiff worked to educate the community about animal well-being.

20.    Plaintiff did not have issues in her employment until Sergeant William Downey became her supervisor around January of 2022.

21.    Immediately upon Sergeant William Downey becoming Plaintiff's supervisor, Plaintiff noticed that Sgt. Downey spoke to her in a negative way, raised his voice at her, and was very disrespectful when he spoke to her.

22.    Sgt. Downey spoke to and treated other women the way he spoke to and treated her, but he did not speak to men that way.

23.    In September of 2021, Plaintiff had a mother dog and eight puppies that were dropped off at the kennel.

24.    Sgt. Downey berated Plaintiff for taking the dogs in, despite that being the purpose of animal control and the shelter.

25.    Sgt. Downey also criticized Plaintiff for giving the puppies vaccinations before adopting them out, saying the kennel could not afford it.

26.    Plaintiff informed Sgt. Downey that the vaccinations were paid for by donations.

27.    Despite this, Sgt. Downey continued to give Plaintiff a hard time about doing her job, upon information and belief, because Plaintiff was a woman.

28.    Plaintiff regularly had to purchase items with her own money, including work boots, because Sgt. Downey would not give Plaintiff the money to do this.

4

29.     Plaintiff also regularly asked Sgt. Downey for cameras for the shelter for her protection and the protection of the animals, but he refused to do this, despite several security issues happening at the shelter and despite Plaintiff being there alone by herself.

30.     In one instance, on March 7, 2022, Plaintiff picked up two dogs due to neglect, and the owners came to the kennel and were screaming and yelling at her.

31.     Plaintiff was afraid because she was there alone by herself.

32.     In another instance, an owner showed up to the kennel and knocked on the door. When Plaintiff opened the door, the owner shoved her way past Plaintiff, knocking her to the ground.

33.     Because no security was ever provided, despite Plaintiff asking repeatedly, her father came to the kennel and added a makeshift lock to the outer door so that it could be locked, and so she could see who was at the door before letting them into the kennel.

34.     On June 15, 2022, the kennel had an attempted break in, the locks were cut and the fencing to one of the kennels was cut through.

35.     Plaintiff had to call an officer down to the kennel to take photos and make a report.

36.     Still, no security system or cameras were installed.

37.     Upon information and belief, Sgt. Downey refused to install cameras despite Plaintiff repeatedly asking and despite these security issues, because Plaintiff was a woman and because he did not want her in the ACO position.

38.     When Plaintiff started working for Defendants, she also did not receive any protection to defend herself against aggressive dogs.

39.     In or around December of 2021 Plaintiff was attacked by a dog.

40.     Plaintiff requested a Taser to be able to defend herself, but six months after she was attacked, Plaintiff was only given pepper spray.

41.     Pepper spray was not a good option for defense because Plaintiff frequently worked outside, causing a significant risk of blow back with the wind.

42.     Blow back was dangerous because it could blind Plaintiff, make it hard for her to breathe, and could prevent her from seeing a dog coming at her.

43.     Around January or February of 2022, another set of puppies came to the kennel.

44.     These puppies needed to be fed every few hours and Plaintiff was feeling overwhelmed with feeding them, taking care of the other dogs, and patrolling the city.

45.     Plaintiff asked Brad Matkin in Human Resources if she could have volunteers because she had been getting so many puppies and was feeling overwhelmed.

46.     Matkins approved Plaintiff's request and Plaintiff found several volunteers who filled out paperwork at City Hall and they were approved.

47.     When Sgt. Downey found out Plaintiff had been using volunteers, he shut the program down.

48.     Sgt. Downey said Plaintiff did not need volunteers.

49.     Plaintiff told him she had been working seven days a week, but he did not change his position.

50.     Upon information and belief, Sgt. Downey sought to make it impossible for Plaintiff to do her job because he wanted to either force her to quit or create a pretext to terminate her employment when she failed to do her job in impossible conditions.

51.     In November of 2021, Plaintiff had to remove two dogs from their owner due to neglect.

6

52. In February of 2022, Plaintiff picked up two puppies who were abandoned in an alley way and, after the state hold expired, she put them up for adoption.

53. Plaintiff was the only one at the kennel who adopted out dogs and that was part of her job.

54. Plaintiff had a family coming in on a Saturday to adopt the puppies.

55. At the end of her shift, Plaintiff got a call from the family that was supposed to adopt the puppies and they were very upset.

56. Plaintiff found out that Sgt. Downey, unbeknownst to her, had adopted out the two puppies to the owners Plaintiff had removed the two dogs from in November of 2021.

57. Plaintiff also saw that the adoption paperwork was done incorrectly.

58. When Plaintiff called Sgt. Downey about this, he stated he did not care and said that "we don't do background checks" on individuals adopting animals.

59. Sgt. Downey was very angry at Plaintiff during the call and stated, "you don't question me, I am your supervisor and you don't tell me how to do my job."

60. Plaintiff was so upset by the way Sgt. Downey was treating her and undermining her, that she emailed Brad Matkin in Human Resources on March 5, 2022, to tell him about the way Sgt. Downey was talking down to her, screaming and yelling at her and undermining her.

61. Plaintiff met with Mr. Matkin on March 7, 2022, and during the meeting, Plaintiff reported to him the way Sgt. Downey was talking to her, belittling her and Plaintiff informed him that he treated her this way because she is a woman and that he treated other women in the community this way.

62. Plaintiff gave him the names of three other women that Sgt. Downey had treated poorly.

63.    Plaintiff also reported his treatment of her to the police chief at the time, Travis Shelton.

64.    Plaintiff told him about meeting Mr. Matkin, about the way she was being treated and about the situation with the puppies being adopted out to individuals Plaintiff had just removed dogs from.

65.    Chief Shelton said he would talk to Sgt. Downey and would get back to Plaintiff.

66.    About thirty minutes after this conversation, Sgt. Downey called Plaintiff into his office and began yelling at her and asked her why she went to the Chief.

67.    Plaintiff told him not to yell at her and began removing herself from the situation and he yelled "get your ass back here" and "get your ass in here and sit down."

68.    Downey continued yelling at Plaintiff and stating she had no right to question him and the way he did his job to the Chief.

69.    Downey stated that Plaintiff was not to talk to the Chief, that she answered to him (Sgt. Downey), and that Plaintiff needed to address anything and everything with him and not the Chief.

70.    This placed Plaintiff in an impossible situation, because when she had addressed the issue with him he had berated her and told her not to question him, and when she had addressed it to others he berated her for going over his head.

71.    On March 8, 2022, Plaintiff had a meeting with Brad Matkin, Sgt. Downey and Chief Shelton to discuss how Sgt. Downey spoke to her and about the puppy's adoption.

72.    Plaintiff spoke to them about the way he talked to her and stated that Sgt. Downey had no right to treat women the way he did.

73.    Plaintiff told them that he used his badge to intimidate women.

8

74. Plaintiff asked Mr. Matkin if he spoke to any of the women she gave him the numbers for but he had not.

75. Upon information and belief, he never spoke with any of these women.

76. After the discussion, Mr. Matkin dismissed Plaintiff's concerns and said it was just a matter of lack of communication between Sgt. Downey and Plaintiff.

77. After Plaintiff's report, Sgt. Downey's treatment of Plaintiff became even worse and he was even more rude, aggressive and threatening.

78. Plaintiff felt like she could not go back to Human Resources because they did nothing, minimized how Plaintiff was being treated, and because doing so made Sgt. Downey treat Plaintiff much worse.

79. There were many days Plaintiff would go home crying and wanting to quit her job because of the way Sgt. Downey talked to her, yelled at her and intimidated her.

80. Plaintiff stayed at the job because she felt that the animals and the community needed her and because she needed to be able to pay her bills.

81. Around May of 2022, Plaintiff went to Sgt. Downey to ask about being in the annual city parade in June.

82. Plaintiff wanted to have a float for animal control, because all the city fire trucks, police, and ambulance all participated in the parade.

83. He said it was not a good idea to include animals, so Plaintiff asked to just drive the ACO truck in parade, but he never got back to Plaintiff.

84. Plaintiff followed up several times and he told her that he had more important things to worry about and had not had time to talk to the Chief.

85. Plaintiff offered to talk to the Chief, but Sgt. Downey refused.

86.     Plaintiff also requested to have an open house on the parade day so people could come in and meet the dogs and to be interactive with the community to try to get the animals adopted.

87.     Before Plaintiff become an ACO officer, the kennels were not open to the public.

88.     Plaintiff had worked very hard to open things up and to make sure the kennels were always clean and presentable.

89.     Sgt. Downey said it was a bad idea and would not let Plaintiff do it.

90.     Plaintiff told him they needed people to come in to adopt the dogs and they needed the dogs to interact with people, but Sgt. Downey said it was not safe for the community to go in.

91.     This was despite individuals coming into the kennel frequently without any issue and despite individuals loving to come in and see the dogs and interact with them.

92.     Upon information and belief, Sgt. Downey was intentionally sabotaging Plaintiff's efforts in order to either get her to quit or to create a pretext for terminating her, because she was a woman and/or in retaliation for her opposing the prior discrimination.

93.     In addition to preventing Plaintiff from doing things to engage with the community and to increase adoptions, Sgt. Downey also made Plaintiff's life difficult in other ways and put her life at risk, upon information and belief, because Plaintiff was a woman and/or in retaliation for her opposing the discrimination.

94.     When Plaintiff called Sgt. Downey for backup, because a situation was not safe, Sgt. Downey usually would simply not respond and not show up.  Later he would just say he was busy or did not hear the call.

95.     Whenever officers were dispatched to a call, they were checked on to make sure they were safe and did not need help, which was called a "status check."

96.    Plaintiff asked Sgt. Downey and the Chief a few times to please make sure that dispatch was doing status checks on her when she was on a call because Plaintiff had to handle mean, vicious dogs and mad, angry owners.

97.    Despite this request and these dangerous situations, status checks were rarely performed for Plaintiff.

98.    Plaintiff was told by Sgt. Downey when she asked about status checks that it was not important to do them for her because Plaintiff was "just animal control."

99.    Plaintiff told him that it was important to her and for her safety in the event, for instance, she was unable to call due to being attacked, and they would not know if Plaintiff needed help if they did not check on her.

100.    Upon information and belief, Plaintiff was denied status checks because she was a woman and/or in retaliation for her opposing discrimination.

101.    Plaintiff was attacked by a dog in December of 2022, and the status check was not performed on her that day.

102.    If Defendants had checked on Plaintiff, she would have had back up much sooner.

103.    Instead, Plaintiff ended up having to call for backup after she was attacked, and it took officers several additional minutes to get to her.

104.    By the time the officers got to Plaintiff, she had already caught the dog, but she was unable to load the dog into her truck due to the injures she had sustained in the attack.

105.    Luckily a neighbor saw Plaintiff get attacked and came out to help her.

106.    On May 23, 2022, Plaintiff was attacked by a dog whiles she was off duty when visiting a rehabilitation center.

107.    Plaintiff brought the paperwork to Sgt. Downey about this.

11

108. He was very rude and stated Plaintiff should not have been at the center, and this was her fault.

109. Plaintiff was taken off patrol due to her doctor's orders of no pushing, pulling, or lifting anything with her right arm and hand.

110. However, Plaintiff still continued to work every day cleaning kennels, feeding the animals, handling phone calls, and meeting with people for adoptions or redemptions of dogs that were brought into the kennel.

111. Sgt. Downey would continuously make comments that it was Plaintiff's fault and "if you wouldn't have been out there, you wouldn't have gotten attacked."

112. During her employment, Plaintiff was also continuously excluded from the police department events and activities.

113. When there was food at the police department, Plaintiff would rarely be notified.

114. When there was a city-wide picture in June for the safety departments, Plaintiff was not notified and was excluded from the picture.

115. On June 21, 2022, Plaintiff was dispatched to a report of a car with a cat locked inside for over thirty minutes, in the direct sunlight, and with windows slightly cracked.

116. When Plaintiff arrived, she noticed the cat was in distress due to the heat.

117. An internal reading taken of the temperature inside the car read one hundred forty-seven degrees.

118. After freeing the cat, it took approximately thirty minutes to get the cat back to a safe body temperature.

119. Plaintiff spoke with the owner when the owner arrived at the kennel, and Plaintiff explained to her the severity of the situation with her cat.

120.    The owner did not understand the severity of the situation, the condition her cat was in and what it took to save her cat's life.

121.    Plaintiff asked the young lady if she would walk outside with her for a minute and asked if she would do Plaintiff a favor and sit with Plaintiff in the car so Plaintiff could show her something.

122.    The owner agreed and they got into her car, which was parked in the shade with the windows rolled down more than halfway.

123.    Plaintiff talked to the owner about car safety, heat outside vs. heat inside a car, showed her a few pictures, asked her if she saw how warm it was in the car and she said she did.

124.    Plaintiff asked her to imagine the car being in the direct sunlight, windows cracked and her cat being in there for over thirty minutes.

125.    They went back inside the kennel, where Plaintiff talked to her more about safety, and the owner finally said she understood, started crying and said that she was so sorry and that it would not happen again.

126.    The owner stated that she was heading back to Indiana, and Plaintiff cautioned her that if she did need to stop, she either needed to take her cat inside or to keep the car running with the air conditioner on and lock the car.

127.    Plaintiff contacted the Animal Control in the owner's hometown to make them aware of the situation.

128.    Plaintiff had the owner sign the Kennel Intake form and told her that she would not be giving her citations and that Plaintiff hoped that she learned her lesson today.

129.    She said she did and gave Plaintiff a hug and left.

130. On Thursday June 23, 2022, Sgt. Downey came to the Kennel and while he was there, asked Plaintiff why she went on the call about the cat and he said they did not have an ordinance on cats.

131. Plaintiff told him that she did not care if it was a cat, dog, mouse or snake that it was locked in a car and was dying.

132. He asked her the details of what happened and after Plaintiff told him, he shook his head, said that it was ridiculous and left.

133. Sgt. Downey did not reprimand Plaintiff at the time for educating the cat owner or taking her out to the car, despite the fact that he used every opportunity to reprimand or berate Plaintiff.

134. In the past, Plaintiff had responded to calls about animals other than dogs without any issue.

135. On June 24, 2022, Plaintiff was at the kennel cleaning and feeding the dogs, when she got a phone call from Sgt. Downey stating Plaintiff needed to drop everything and go to Mr. Matkin's Office in City Hall.

136. When Plaintiff arrived, Sgt. Downey, Mr. Matkin and Chief Shelton were sitting inside and Mr. Matkin told her to sit down.

137. Chief Shelton immediately stated "[y]our actions performed due to the cat call with making the girl sit in the car were not defendable in court if she were to complain so we are letting you go."

138. They did not ask Plaintiff for her side of the story or give her any time to tell what had happened.

139. Upon information and belief, no one had ever made a complaint about Plaintiff.

14

140.    Defendant never told Plaintiff about any complaint that had been made about her.

141.    Plaintiff had never been written up or disciplined prior to this time.

142.    The cat owner voluntarily got into the car with Plaintiff and was free to leave at any time.

143.    Plaintiff had never done this before and it could not be established that there was any pattern of such conduct of which the city was aware.

144.    Upon information and belief, Defendant knew that Plaintiff's action did not subject it to any liability.

145.    Upon information and belief, the stated reason for Plaintiff's termination was a pretext.

146.    Upon information and belief, Plaintiff was actually terminated because she was a woman and/or in retaliation for opposing discrimination.

147.    Plaintiff was not able to get all her stuff from the kennel and followed up several times but did not receive it.

148.    When Plaintiff was made to leave the kennel, Plaintiff was unable to find her cat, Caelee, that the Chief allowed her to have at the kennel.

149.    Sgt. Downey said Plaintiff was not allowed on the property so Plaintiff asked that her cat be taken care of until Plaintiff could get her.

150.    However, Plaintiff received several messages about the cat being outside, not being fed or watered, and not being allowed in the kennel when it was almost one hundred degrees outside.

151.    Several people took Carlee food and water since the kennel was not taking care of her and since Plaintiff was not allowed on the property.

152. After two weeks, Caelee was finally caught and brought to Plaintiff.

153. Caelee was extremely skinny and not cared for.

154. This caused Plaintiff significant distress over the mistreatment of her animal.

155. This also made Plaintiff feel very concerned for the care of the animals at the kennel.

156. Upon information and belief, Plaintiff was discriminated against because she is a woman and retaliated against because of her protected complaints of discrimination.

157. After she was terminated, Plaintiff's personal belongings on the premises of Defendants were not returned to her by Defendants, despite Plaintiff requesting their return.

158. The belongings included but were not limited to holiday decorations, a phone charger and an adapter (hereinafter, "Personal Items").

159. During her time working for Defendant, Plaintiff was not paid for all the hours she worked and was not paid overtime for all these hours.

160. Defendants complained about Plaintiff receiving overtime for the work she did.

161. It was not possible for Plaintiff to complete all her job tasks in forty (40) hours a week, and when Plaintiff requested assistance, it was denied.

162. Plaintiff continued to perform work above forty (40) hours and was not paid for this work.

163. Upon information and belief, Plaintiff was discriminated against because she is a woman and retaliated against because of her protected complaints of discrimination.

## COUNT I
## DISPARATE TREATMENT
## BASED ON SEX IN VIOLATION OF TITLE VII

164.    Plaintiff incorporates the allegations contained in the above-stated paragraphs as if fully set forth herein.

165.    During Plaintiff's employment with Defendants, Plaintiff was subjected to different terms and conditions of employment, based on her sex, female, by Defendant.

166.    During Plaintiff's employment with Defendants, Plaintiff was subjected to an ongoing practice and/or pattern of discrimination/disparate treatment based on her sex, female, by Defendants.

167.    Plaintiff was subjected to different work requirements than other similarly situated employees of a different sex in regard to the terms and conditions of her employment.

168.    Plaintiff's sex was a motivating factor in Defendants' decision to discipline Plaintiff.

169.    Plaintiff's sex was a motivating factor in Defendants' decision to terminate Plaintiff's employment.

170.    Plaintiff's sex was a motivating factor in Defendants' decision to harass Plaintiff.

171.    Defendants' actions and/or omissions constitute a pattern or practice of discriminatory behavior.

172.    All actions or inactions of or by Defendants occurred by or through its agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

173.    Defendants' actions constitute unlawful employment discrimination against Plaintiff in violation of Title VII, as alleged herein.

17

174.     As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages which include emotional distress, pain and suffering, past and future wages and benefits, career damage and diminished career potential, mental distress in the form of embarrassment, degradation and humiliation, increased anxiety, increased difficulty sleeping, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and against the Defendants, jointly and severally, for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, for reasonable attorneys' fees and costs incurred herein, punitive damages, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as allowed by law and that this Court deems just and proper.

## COUNT II
## HOSTILE WORK ENVIRONMENT
## BASED ON SEX IN VIOLATION OF TITLE VII

175.     Plaintiff incorporates the allegations contained in the above-stated paragraphs as though fully set forth herein.

176.     During Plaintiff's employment with Defendants, Plaintiff was subjected to a hostile and offensive work environment based upon her sex, female, by Defendants' employees and Plaintiff's supervisors, which constituted a continuing pattern of unwelcome harassment, which Plaintiff found, and which a reasonable person would find, to be offensive, and which altered the terms, conditions and/or privileges of her employment.

177.     Defendants' actions and/or omissions constitute a pattern or practice of discriminatory behavior.

18

178. All actions or inactions of or by Defendants occurred by or through its agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

179. Defendants' actions constitute unlawful employment discrimination against Plaintiff in violation of Title VII, as alleged herein.

180. As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages which include emotional distress, pain and suffering, past and future wages and benefits, career damage and diminished career potential, mental distress in the form of embarrassment, degradation and humiliation, increased anxiety, increased difficulty sleeping, loss of enjoyment of life, and other non-pecuniary losses.

181. Defendants' actions were malicious and were committed with reckless indifference to the Plaintiff's rights.

182. By failing to take prompt and effective remedial action, Defendants in effect condoned, ratified and/or authorized the discrimination against Plaintiff.

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and against the Defendants, jointly and severally, for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as allowed by law and that this Court deems just and proper.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII

183. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

19

184.    Plaintiff is a member of a protected class because of her sex, female.

185.    Plaintiff engaged in protected activity under Title VII by reporting sex discrimination and harassment, including to HR, informing Defendants of discriminatory inappropriate and harassing conduct, and by otherwise opposing the discrimination.

186.    Defendants took adverse actions against Plaintiff as a result of her engaging in the aforementioned protected activity, including increased harassment and termination.

187.    As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages which include emotional distress, pain and suffering, past and future wages and benefits, career damage and diminished career potential, mental distress in the form of embarrassment, degradation and humiliation, increased anxiety, increased difficulty sleeping, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and against the Defendants, jointly and severally, for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, for reasonable attorneys' fees and costs incurred herein, punitive damages, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as allowed by law and that this Court deems just and proper

**COUNT IV**
**FAILURE TO PAY WAGES IN VIOLATION OF THE KWPA**

188.    Plaintiff hereby restates and incorporates by reference as if fully stated herein the allegations contained in the foregoing paragraphs.

189.    Plaintiff was an employee of Defendants.

190.    Plaintiff worked for Defendants on an hourly wage basis, at a rate of thirteen dollars and ninety-one cents ($13.91) per hour.

20

191.    Plaintiff was not exempt from the payment of overtime, so her compensation also included overtime pay of one and a half times her usual rate per hour for hours worked beyond forty (40) hours per week.

192.    Defendants have failed to pay to Plaintiff all her earned wages.

193.    Plaintiff worked over forty (40) hours many weeks.

194.    Despite having worked those hours, Plaintiff was not paid for all such hours.

195.    In failing to pay these hours due, Defendants failed to pay Plaintiff on a timely basis, in violation of the KWPA.

196.    In doing so, Defendants failed to pay Plaintiff her earned overtime pay, which is part of her "wages" as defined by the KWPA.

197.    As a consequence of its willful violations of the Kansas wage laws, wages have been unlawfully withheld by Defendants from Plaintiff, for which Defendants are liable, together with pre-judgment and post judgment interest, reasonable attorney fees, and costs of this action.

WHEREFORE, Plaintiff requests that this Court enter judgment in Plaintiff's favor and against Defendants, jointly and severally, and award Plaintiff damages as proven at trial, including punitive damages, attorneys' fees, and related litigation and enforcement expenses and such other and further legal and equitable relief as just and proper.

## COUNT V
## FAILURE TO PAY WAGES AND
## OVERTIME IN VIOLATION OF THE FLSA

198.    Plaintiff hereby restates and incorporates by reference as if fully stated herein the allegations contained in the foregoing paragraphs.

199.    Plaintiff was employed by Defendants.

21

200. During this time, Plaintiff performed work for Defendants on an hourly wage basis, at a rate of thirteen dollars and ninety-one cents ($13.91) per hour.

201. Plaintiff regularly worked more than forty (40) hours a week, but Defendants did not pay Plaintiff for all her hours worked.

202. Defendants permitted Plaintiff to work these additional hours without providing the compensation she was owed.

203. Plaintiff brings this Complaint individually pursuant to the FLSA. 29 U.S.C. § 216(b).

204. Alternatively, upon information and belief, Plaintiff was subject to the refusal to pay minimum wage and overtime in violation of the FLSA because of Plaintiff's sex.

205. At all relevant times, each of the Defendants has been, and continues to be, an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

206. At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Plaintiff.

207. The FLSA requires each covered employer, such as the Defendants, to compensate all non-exempt employees minimum wage for all hours worked and overtime compensation, at a rate of not less than one-and-one-half the regular rate of pay, for work performed in excess of forty (40) hours in a work week.

208. Plaintiff is not exempt from the right to receive minimum wage and/or overtime pay under the FLSA and is not exempt from the requirement that her employer pay her overtime compensation under the FLSA.

209. Plaintiff is entitled to be paid minimum wage and overtime compensation for all overtime hours worked.

22

210. At all relevant times, Defendant had a policy and practice of failing and refusing to pay Plaintiff minimum wage for all hours worked and overtime pay at a rate of not less than one-and-one-half the regular rate of pay for work performed in excess of forty (40) hours in a work week.

211. Defendant's failure to compensate Plaintiff minimum wage for all hours worked and overtime compensation at a rate of not less than one-and-one half times the regular rate of pay for work performed in excess of forty (40) hours in a work week constitutes a violation of the FLSA, including 29 U.S.C. § 207(a)(1).

212. The foregoing conduct constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

213. Plaintiff seeks damages in the amount of all respective unpaid minimum wage and overtime compensation at a rate of one-and-one half times the regular rate of pay for work performed in excess of forty (40) hours in a work week, plus liquidated damages, recovery of all attorneys' fees, costs, and expenses incurred in this action, to be paid as provided by the FLSA, 29 U.S.C. § 216(b), and such other legal and equitable relief as the Court deems just and proper.

WHEREFORE, Plaintiff requests that this Court enter judgment in Plaintiff's favor and against Defendants, jointly and severally, and award Plaintiff damages for minimum wages and overtime compensation due for the Plaintiff, liquidated damages, to be paid by Defendants; costs and expenses of this action incurred herein, including reasonable attorneys' fees and expert fees; and any and all such other and further legal and equitable relief as this Court deems necessary, just, and proper.

**COUNT VI**
**CONVERSION**

214.    Plaintiff hereby restates and incorporates by reference as if fully stated herein the allegations contained in the foregoing paragraphs.

215.    At all times after Plaintiff purchased her Personal Items, Plaintiff was the sole rightful owner of the Personal Items and had a right superior to Defendants to ownership, possession of, and control over the Personal Items.

216.    At all times after Plaintiff adopted her cat, Caelee, Plaintiff was the sole rightful owner of Caelee and had a right superior to Defendants to ownership, possession of, and control over Caelee.

217.    When Plaintiff was terminated, despite Plaintiff's requests for return of the Personal Items, Defendants, acting knowingly, willfully and without reasonable cause or excuse, asserted the right Defendants to ownership, possession and control of the Personal Items and failed and refused to return the Personal Items to Plaintiff.

218.    As a direct and proximate result of Defendants' willful, wrongful and unjustified exercise of dominion, possession and control over Plaintiff's Personal Items, including without limitation, refusing to return the Personal Items, and/or destroying such items, Plaintiff was (a) deprived of possession; (b) prevented from accessing the Personal Items; and (c) was compelled to incur attorney's fees in litigation in an attempt to compel Defendants to return the illegally seized Personal Items.

219.    As a direct a proximate result of Defendants' willful, wrongful and unjustified detention of the Personal Items, Plaintiff has been damaged in at least the following respects:

        (a)    Lost benefit and enjoyment from the use of the personal items while they were being withheld from her; and/or

(b)   Lost benefit and enjoyment of spending time with her cat, Caelee,

(c)   Attorney's fees Plaintiff incurred in; and/or

(d)   Anxiety and stress caused by the wrongful failure to return the Personal Items and deprivation of the Personal Items; and/or

(e)   Anxiety and stress caused by the wrongful failure to return the Caelee, the failure to care for Caelee, and deprivation of the Caelee.

220.   The acts and omissions by Defendants set out hereinbefore were willful, reckless, malicious and/or without reasonable justification and were designed and intended to deprive Plaintiff of her rightful ownership, possession and control over the Personal Items, thereby, entitling Plaintiff to recover exemplary damages in an amount that is fair, just and reasonable under the circumstances.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, and for all compensatory damages and other damages, including emotional distress, diminished value of the Personal Items, attorney's fees incurred in the underlying litigation; as well as for assessment of all costs and expenses against Defendants, and for such other and further relief, including but not limited to, other damages as may be deemed just and proper.

**Demand for Jury Trial and Designation of Place of Trial**

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

25

Respectfully Submitted,

EDELMAN, LIESEN & MYERS, L.L.P.

*/s/Sarah Liesen*
Sarah Liesen, KS # 26988
208 W. Linwood Blvd.
Kansas City, Missouri 64111
Telephone: (816) 301-4056
Facsimile: (816) 463-8449
Email: sliesen@elmlawkc.com

ATTORNEY FOR PLAINTIFF

26